Good morning, your honors, and may it please the court. My name is Michael Patton, and I represent Judge Eighmy in this appeal. This court should reverse because, among other reasons, Judge Eighmy is entitled to qualified immunity. When Judge Eighmy asserted qualified immunity at trial, the district court correctly asked both parties if they had an analogous case, noting that this case poses, in the district court's words, an unusual fact situation. But plaintiffs were unable to provide a single analogous case, and that should have been fatal for their claims. This court should reverse for all of the reasons outlined in our briefing, but today I'd like to focus on three points related to qualified immunity specifically. First, no clearly established law provides that Judge Eighmy effectuated a seizure when he repeatedly urged the children- I guess you're talking about it by making that statement about no analogous case. You're pointing to the clearly established aspect of qualified immunity. But what about the argument that might be made that, in this case, the conduct of this judge was so far afield of appropriate judicial and authorized judicial conduct that it's just never happened before? Yes, Your Honor. But does that, in and of itself, mean that qualified immunity or immunity is afforded? Yes, Your Honor. So two responses to that. I think the first response is to emphasize Justice Thomas's opinion in the Wesby case, where he reversed the D.C. Circuit and emphasized the specificity requirement as especially important in the Fourth Amendment context. The second response is that the line of cases that dispense with the specificity requirement, Appley's site, Hope v. Peltzer, for example, and Taylor v. Riojas, those are clearly fact patterns that were so obviously unconstitutional that specificity was not required. For example— But what about here, when your client didn't get judicial immunity? And so that already, as a factual matter, places it so far outside the judicial role that he doesn't get immunity there. Doesn't that inform Judge Shepard's question about whether this might be so outside the grounds that you don't need an exact case? So Your Honor, two responses to that. I think, first, regarding Rocket One, I would like to emphasize—and this was a point that Appley's made repeatedly in their briefing, they kept referring to it as the law of the case—Rocket One decides a narrow question, and that is whether Judge Amy was engaged in a judicial act for purposes of what plaintiffs had alleged at the motion-to-dismiss stage. Regarding whether this is in the authority of a judge, I would point this Court's attention to actually Judge Shepard's opinion in CSI v. Large, that's 18F 4th 989. That case involved a Minnesota county engineer who stopped two trucks on a roadway that he believed were overweight. The plaintiffs argued that that's a role that police officers should be engaging in, not county engineers, and this Court granted qualified immunity anyways, noting that there was no specific case on point. That's what we believe that this Court should do here as well. Additionally, regarding the authorization under Missouri State law that Rocket One discusses, that was a discussion for purposes of judicial immunity. I'm not quite sure why it would change the Fourth Amendment analysis as to whether this was a reasonable seizure. Furthermore, we believe that there wasn't actually a seizure here in the first place, even crediting plaintiff's evidence, and I would turn the Court's attention to the testimony of Mr. Kayden Rocket. This is on direct examination by plaintiff's counsel at page 88 of the transcript. This is after the children were taken down to the juvenile office. Mr. Rocket testifies, quote, I knew that the only way to get out of this situation was just to give in and go with our mother. Then at pages 209 to 210 of the transcript, Ms. Brooklyn Rocket, the other plaintiff, testified that the children's mother, their guardian ad litem, their counselor, and Judge Kayden Rocket were not even in the courtroom and they were not even imploring the children to please go home. Let me ask you this. I know that you're going to say it's different, but if I walked out of this courtroom right now, found some random person out there and said, I'm arresting you and taking you to holding cells on four, and I'm going to come back and I'm going to watch you change into prison garb, and then I'm going to come back in an hour and release you, are you telling me I'd have qualified immunity? No, Your Honor. I think that that would be a seizure and that would be an example where there clearly was no probable cause. In that instance, assuming that Your Honor did not have probable cause. What's different here? There was no probable cause. These kids weren't even in the courtroom. Your Honor, we have, I have two responses to that. So I think that the first response is that we believe that the children were beyond parental control here. So even assuming that this court finds a seizure when Judge Amy was repeatedly urging the children to leave, the Missouri state law would provide probable cause when children are beyond parental control. And so I don't want to go with you as beyond parental control. Do you have a line of case law in Missouri that says when a kid defiantly says, I don't want to do that, that that's beyond parental control for this purpose? So Your Honor, two responses to that. I think that the first response would be in the world of qualified immunity, the burden is not on Judge Amy to present a case where a court said, okay, this is what beyond parental control means. But we kind of need to understand what beyond, if it's the basis for a seizure, at least I would like to know what they mean by beyond parental control. That's a pretty loose phrase. Your Honor, I think the statute is not detailed as to exactly what beyond parental control means. But what I will say here is the facts, as recounted in the plaintiff's case in chief on direct examination by their counsel, I think shows undisputably that a reasonable official could deem these children as beyond parental control. The undisputed testimony is that Judge Amy intervened in this scenario only because he was asked to. That's page 229 to 230 of the transcript. Judge Amy said that he received a call indicating that the Rockett children wished to speak with him after two hours of disputing with the mother. Judge Amy also separately received a text from counsel asking him to intervene. The mother testifies on page 366 of the transcript. This is on direct examination by plaintiff's counsel. The kids were refusing to leave with me, and I was at a loss as to what to do. Mr. Bart Rockett, the children's father, and the next friend of Brooklyn Rockett at trial, this is page 319 to 320 of the transcript, in 323, said that he believed at the time of the hearing that the children would rebel and run away if they were sent home with their mother. Later, on redirect, this is page 323 of the transcript, plaintiff's counsel elicited testimony from Mr. Bart Rockett, where Mr. Bart Rockett testified that he thought the children would run away in violation of their custody agreement from their mother in Utah and to Mr. Rockett in California. So why not either hold another hearing or call somebody in the Division of Social Services or whatever the appropriate agency is to make sure that the order was enforced? I mean, again, I don't go outside and start figuring out, OK, are they doing exactly what I'm telling them and follow them back to their whatever, if there's a judicial order. Yes, Your Honor, I understand. I will acknowledge that a hearing probably would have been the better course in this case, but that's not the question on qualified immunity. The other thing that I would like to say is that, and I believe that Chief, or not Chief Juvenile Officer Scott Gilman testifies on page 535 of the transcript, this is on direct examination by plaintiff's counsel, that the Juvenile Office accepts walk-ins. And so we believe that by asking the children to follow him down to the Juvenile Office, Judge Amy was doing something that anyone else could do. And then as well, there's testimony from the Chief Juvenile Officer on direct examination by plaintiff's counsel saying that the Juvenile Officers are the ones that once a walk-in comes in, they make the ultimate decision as to whether the children should be temporarily seized. I just want to follow up on one thing that Judge Shepard asked about. Why isn't this case as simple as Judge Amy was part of a seizure. He took them down there. He instructed, stood there while they changed and instructed him to lock them up, came back an hour later. Why isn't it as simple as saying, there's a seizure here, it's really indisputable, and the seizure was unreasonable because it was not accompanied by probable cause that a crime had been committed. Why isn't it that easy and that that's a clearly established principle? So Your Honor, two responses. I think that the first point would be section 211.061. That contemplates that a child can be taken into custody without a warrant when there is probable cause to believe that the child is beyond parental control. OK. So we're back to that. If Your Honor were to find that there was an absence of probable cause, I think that there is a second legitimate basis for the seizure. And that is the safety concerns for the children. There are multiple cases in this court's precedents. Stanley v. Hutchison, Welter v. Wilson, that's 153F4652. That was decided just a few months ago. I'd also turn the court's attention to KWP v. Kansas City Public Schools. That's actually a case cited in Appelli's brief that say even if there's no probable cause that the child committed an offense, a reasonable official could still detain the child temporarily for the child's safety. Interestingly enough, again, the case cited in Appelli's brief, KWP, ironically, I believe that's the closest factual scenario that plaintiffs cite involving a case where this court rejected a Fourth Amendment claim of a seven-year-old. There, a school police officer handcuffed the seven-year-old for 20 minutes out of concern for the seven-year-old's safety. The district court denied qualified immunity, but this court reversed because there was no Fourth Amendment violation, and in any event, the court held that the violation was not clearly established. Furthermore, Your Honors, going back to the point about beyond parental control, because there was very significant evidence about that in plaintiff's case in chief at trial. I would turn the court's attention, in addition to the mother saying they were out of my control, the father saying I believe that they would run away from me. To the testimony of the children's counselor, Dr. Cindy Baker, who was at the custody proceedings, this is on direct examination by plaintiff's counsel. At page 340 of the transcript, she said, quote, the children were so disrespectful to Judge Amy that I could not believe it was the Rockett children. They referred to him as a little judge from Missouri and that he could not tell them what to do. Then on 341 to 342, this is Dr. Baker again on direct examination by plaintiff's counsel. The Rockett children, quote, were hostile, and at one point when I looked at Caden, he was so worked up that his fists were actually bald. Plaintiff's counsel asks, have you said previously that you had concerns for Judge Amy's physical safety? Dr. Baker responds, of course I did. Then on page 342 to 343, again direct examination by plaintiff's, Dr. Baker says that in all her years as a counselor, she had never seen children act like the Rockett children did toward Judge Amy. Furthermore, going back to the safety point, if the court were to find that the children were not beyond parental control and there were no probable cause of that, I would direct the court's attention to the testimony of Chief Juvenile Officer Ray. She was the one who runs the juvenile division, has ultimate authority there. She testified that she personally, this is on pages 452 to 453 and 459 of the transcript, again direct examination by plaintiff's counsel. She says that she personally decided to place the children in the holding room because she was concerned for their safety. She also testifies on pages 474 to 475, again direct examination by plaintiff's counsel, that she gave the children's mother her phone number in case they tried to run away because she was concerned that they would run away after they went home, and that she felt the need to watch the children walk to the car to make sure that they stayed safe. Your honors, these are all points that could go to why a reasonable official could believe that either the children were beyond parental control, as Judge Amy testified, or a reasonable official could believe that it was necessary to temporarily seize them in order to make sure that they stayed safe. Unless this court has any further questions, I would like to reserve the remainder of my time.  Mr. Eastwood, you may proceed. Thank you, Judge Shepard. May it please the court, in the light most favorable to the jury verdict, Judge Amy had taken off his robe, his court proceedings were done for the day, he entered the hallway, he inserted himself into a discussion between the mother of the children, he jailed them, he threatened them with foster care, all without opposing counsel, the GAL, any hearing, and without parental knowledge and consent. I want to turn to your question, Judge Kelly, about this statute, the 211-031 statute. You're right, that statute requires a petition and a hearing. And if you look at Judge Amy's best case, arguably for QI, which is the Ramey v. Engelken case, that was the case where much more serious facts, the boy wrote essays in class about murdering his teacher, and referred to the Columbine shootings. Even there, there was a hearing, and there was a warrant for the seizure of the boy. And if you look at the through lines of this court's cases, as well as other circuits that are in accord, where qualified immunity has been denied in the context of a child seizure, I think there are roughly seven factors, and this case meets all of them for affirmance. Number one is substantial or significant departure from professional guidelines. Here, the Missouri Juvenile Justice Guidelines, the jury heard those, nothing in the plain text of the guidelines permitted this type of seizure. And the juvenile officers both testified, as did Judge Amy, they'd never seen anything like this in each of their individual many decades of experience and service. Number two, the lack of process. If you have a hearing, if you do something judge-like, then you get an order pursuant both to the Missouri statute here, the two cases unhelpfully from the state courts of appeal are really not factually opposite. They deal with more child abuse or extreme circumstances. But you would have something that an appellate court could review. Third, the children were calm. They were not physically defiant. I understand that Judge Amy is trying to kind of re-argue against, re-argue the facts, but we have to be acting here in the light most favorable to the jury verdict. The jury heard evidence both ways, and it arrived at its verdict that this was an unreasonable seizure. The children were not physically resisting. There was no real concern for child safety. If we look at Stanley II, Stanley V. Hutchinson, I know you were on that panel, Judge Strauss. You know, QI was denied at the pleading stage, but then granted at MSJ, but that's because of this bleach-like substance, which was a real concern, particularly in the child abuse standard, that the parents were giving the kids bleach to drink out of some sort of unclear purpose, and there was no threat. The children were not threatening anyone, and they were not a threat to themselves. What are they referring to when your colleague on the other side says that there were concerns about Judge Amy's safety? I think that's unsupported by the record. He's trying to argue facts against the record. To be sure, there was a court counselor. She testified that her primary source of income was working for Judge Amy in his courtroom, and the jury heard evidence contrary to that, and they were free to disregard that testimony. Judge Amy themselves said that the children were calm. After all, before the seizure began, he was in the conference room, right? And I know Judge Strauss at Rocket One, we talked about that at oral argument, that the informality of family court proceedings, sometimes judges need to do things a lot less formal than federal court, pulling parties, or in this case, non-parties, but the children who are sort of the rest, so to speak, of the custody dispute into a conference room. But there simply is not evidence in the record to support that, and besides, we have to be deferential to the jury verdict. I'd also say that this act, to your point, Judge Strauss, was quite outside Judge Amy's discretionary authority. Certainly, in Rocket One, and the facts have not materially changed, if anything, they've been remarkably consistent from pleading to MSJ to trial. There's no judicial immunity for doing something that judges don't do, which is seizing children, but if we are to think of a QI case for a judge, and we have not been able to locate any case where a judge was granted qualified immunity, and I don't believe Judge Amy has identified one either, perhaps, hypothetically, that QI could exist in something ancillary to the judge's job. So perhaps an administrative or hiring type act, but I don't think that seizing something, to quote Rocket One, judges do not do double duty as jailers, particularly not without any process. Third, the seizure had a punitive purpose. This was not a timeout, like in the school context, or at least not a reasonable timeout. It was punitive, it was coercive, it was disciplinary, and it was also not done in a split-second fashion. If we look at qualified immunity, particularly in Fourth Amendment, and it arises more in excessive force, but some judges in courts, including the Supreme Court and other circuits, have sort of emphasized the need for this heightened factual specificity or identicality even. I don't think that identicality is required, but where you have split-second decision-making, intense, dangerous, uncertain circumstances, Judge Amy testified that this was not a split-second decision. He had time to reflect and deliberate before he made the choice to do what he did. I don't think it's particularly germane to the seizure analysis, but to the extent he's arguing that he wasn't the one who patted down the children or physically turned the jail cell door, I think that's not germane. I mean, if anything, Stanley won, Stanley V. Finnegan, the investigator who was denied qualified immunity there, in fact, she orchestrated the seizures, but it was a different police officer working for her who performed the physical seizure at her direction. And there are also cases outside the child context. I mean, certainly there's the Hartland cases, the Stanley cases. There's a 2022 case called Doe v. Aberdeen. Now that occurred after the incident here, but it relies on, for the clearly established analysis, wholly on cases before the incident here. So I think it's useful because it involves a 25-minute seizure of a child in a locked room. And there's also cases not involving children, like Peterson v. City of Plymouth, where this court is held in a 25-minute seizure without probable cause or without even really reasonable suspicion is unreasonable, and there is no qualified immunity. A few other issues, absolute immunity, as I mentioned, nothing has changed. Color of law, Judge Amy was flexing his authority as a judge within his courthouse. He had access to secure areas of the courthouse where private individuals could not go. Was that issue preserved? I couldn't tell from the colloquy with the district court whether when the counsel said no, color of law is no longer at issue. What was the context there? Our position, Judge Kelly, is no, it's not preserved because they took it out of the case at the jury instruction conference. But obviously to this court, I'd rather argue merits, of course, because this court may want to get into merits. And my position is simply only a judge could have done this, and the best evidence for that is really the juvenile officers testifying as much. A couple other things because my time is running out. Well, I have a question about, kind of a procedural question, I guess, or a question of identification of issues. In this case, qualified immunity was raised. There was a ruling on that on summary judgment, but no interlocutory appeal. So now the case goes to trial, and we have this decision that's on review. Are we really even still, are we still talking about qualified immunity? Judge Amy, it is your honor, and there are cases where this court has held qualified immunity can be raised at any time. I mean, he's certainly been a, he has chose to litigate this case throughout, to the first interlocutory appeal, to trial, now on this appeal, that really ties in with my fees issue. You can't litigate vociferously and then complain about the fact that you chose to litigate one thing on fees. I guess the only difference it makes is whether we think about the clearly established prong. Well, my friend, yes, your honor. I mean, my friend, Mr. Moore, is going to talk about obviousness and hope, but yes, it does. One final thing, if I may indulge the court, Parada v. Anoka County, Judge Strauss, you're familiar with that, 54 F. 4th, 1016. That is very on point here, I think, to the fees analysis, $1, unlike here, $10,000 for a five-hour seizure in a county jail. Thank you. Mr. Moore? Good morning, your honors, and may it please the court. My name is Dylan Moore. I'm an attorney for the Institute for Justice, who is an amicus in this case, supporting appellees and affirmance of the decision below. I think we should jump directly into clearly established law and the qualified immunity standard, and the first thing I'd like to say is that clearly established law as a standard isn't really different than the obviousness cases like Hope and Taylor. The obviousness cases are explaining how law can be clearly established without a carbon copy precedent that presages the exact facts that are before the court now. And so when Judge Amy argues that the only way for the Rocket children to pierce qualified immunity is by identifying carbon copy case law, that just isn't the case. That's not the right mode of analysis for a situation like this one. And we know that from the text of Hope, where the Supreme Court said officers can still be on notice that their actions are unconstitutional and violating clearly established law, even in novel factual situations. And this makes sense. It would be really strange if it were otherwise. Like then-Judge Gorsuch put it in a case called Browder in 2015, a different position would be remarkable, and it would be that the most obviously unconstitutional conduct is the most immune from liability only because it's so flagrantly unlawful that few dare its attempt. And that's exactly what we have here. Qualified immunity is all about fair notice. And to rule in favor of Judge Amy in a case like this is to rule that a sitting judge did not have fair notice, that it's unconstitutional to shed your robe and take two innocent children to jail without any probable cause and without any reasonable suspicion that they had done anything wrong. That's just absolutely not the state of clearly established constitutional inquiry. It's not the state of the law. And I want to address the Wesby case that Judge Amy raised. That case, two things. One, there was no Fourth Amendment violation in that case. But maybe more importantly, at page 64 of the Supreme Court's opinion, it expressly recognizes the obviousness dimension of clearly established law. It just says it didn't apply there. But of course it applies here. Every judge is on notice that this sort of behavior is unconstitutional. And I want to talk a little bit more about something Judge Kelly raised, which was the judicial role of it all. I think in a lot of circuits, when an officer steps beyond the things that they are allowed by law to do, that is a de facto clue, or it's dispositive in a lot of cases. The qualified immunity just doesn't apply. Now, my friend on the other side raised the CSI case. But CSI actually left this question open. It was an argument that the plaintiffs had raised in that case. But this court said, well, the plaintiffs haven't shown that this was clearly outside of the engineer's scope of duties, blocking off a road so that a truck couldn't come down that road when it was over the weight limit, and then alerting local law enforcement officers that this was happening. That's all that happened in that case. And this court said that, look, whatever the scope of authority exception to qualified immunity might be, it doesn't apply here. So that's a live question in this circuit right now. I think this case is a great candidate for a ruling similar to if a government official steps beyond their delegation of discretion, their delegation of powers, to violate the Constitution, of course qualified immunity doesn't apply. Because you should know that it's unconstitutional for you to step beyond the things that you're allowed to do by delegation of law. One note I'd like to make in this case that is different than the last qualified immunity case that was before this court this morning, and a lot of other qualified immunity cases, Judge Amy had time to think here. There was no split second decision making. And we know that that's relevant to the qualified immunity analysis. Because in Taylor versus Riojas, the Supreme Court explained that qualified immunity is more appropriate when necessity or exigency prompts an officer's actions. They have to act in the moment to keep themselves safe. There's nothing like that here. And this court had a case called Locke versus County of Hubbard decided this past September denying qualified immunity to officers at the pleading stage, where police officers used pressure point pain compliance techniques on nonviolent protesters, even though there was time to think about how best to disperse the protesters. There was no reason for the police officers to have to use these techniques, because they had time to think. And in this case, Judge Amy had plenty of time to think about how best to handle this situation. But certain options were certainly off the table. And this was one of them. And so I think that there are really two ways that this court could handle the qualified immunity question in this case. The first being sort of a narrow ruling that it's clearly established that judges can't, as this court put it in Rocket One, do double duty as jailers and have innocent children imprisoned outside the judicial process. The broader way to handle this case is maybe to say something like it's obviously unconstitutional for a government employee to step beyond the scope of their authority and violate the Fourth Amendment. You know, real quick, if I could follow up with one question. It's not easy, though. Because if, for instance, suppose somebody was acting up in the audience and I didn't do contempt proceedings, but I said, you know, court security officer, arrest him and take him downstairs and detain him because somebody was acting up, arguably I'd be acting outside of my scope of my duties by a bit. But you could see where a judge might believe he has sort of the inherent authority to be able to control his or her courtroom. Yes, Your Honor. I think there is some inherent authority for judges to control their courtroom. And I think if you, from your position up there, ordered that I be thrown out and a court-martial threw me out, I think that that actually probably would be covered by judicial immunity. But if you came down from the bench and kicked me out yourself, I think you would not be covered by any immunity. And that's actually exactly what happened in a Ninth Circuit case called Gregory v. Thompson from 1974. So if the Court's interested in that line, I think that would be a good case to start with. I'm not sure if there's anything in the record along these lines. But it occurs to me that it might be significant to information about, for example, the size of the county and the number of judges in that particular jurisdiction and how informal their judicial practice has been in that locale. I'm thinking about there are some very small counties in Arkansas where the courthouse is very small. Only one judge visits the county. And a lot of the officials in the county administration do multiple duties. And there is some informality that's developed over time. What are your thoughts about that, if that would be relevant here? Yes, Your Honor. I think maybe it's relevant. I wouldn't want the Court to adopt a position that would remove the ability of judges to be flexible in handling court affairs or even informal when the situation calls for it. I think the thing to keep in mind, though, is that no matter the configuration of a court, the size, the practices, the Fourth Amendment draws some pretty hard lines. And this case is so far beyond the line of what's permissible. The Court said it itself, judges don't do double duty as jailers. I think that's true in a town of 100 people and in a metropolis. Thank you, Your Honors. Thank you very much. Mr. Patton? Yes, Your Honor. Thank you. May it please the Court. I'd like to start off with just a few points. First of all, to answer your questions just now, Judge Shepherd, there are three judges in the Taney County Judicial Circuit. Judge Amy was a guardian ad litem for 20 years, representing children before he became a judge. He's been a judge for 10 years since. Regarding plaintiffs' allegations that we are engaging in a factual dispute, that's not the case. The evidence that I presented to this panel today was mostly from direct examination by plaintiffs' counsel. This Court said in Vetter v. Farmland Industries that when you're viewing the record in the to the prevailing party, you assume as proved all the facts that the prevailing party's evidence tended to prove. We offered statements from direct examination by the children's counselor, the mother saying that she had no control, the father saying that he believed at the time of the custody hearing that the children would try to run away. Furthermore, to your point, Judge Shepherd, about whether qualified immunity can be raised when we didn't appeal after the summary judgment stage, I believe that we certainly have the opportunity to do that. We raised it in our answer to the operative complaint. We raised it summary judgment. We raised it in all three of our motions for judgment as a matter of law. So this issue has certainly been preserved. I'd like to respond finally to Amiki's representations about Wesby and the specificity requirement. I would like to quote Justice Thomas' statement in Wesby. This is just reading from the majority opinion. I think it dispels his argument quite clearly. In Wesby, Justice Thomas said, quote, it is not enough that the rule is suggested by then existing precedent. We have stressed that the specificity of the rule is especially important in the Fourth Amendment context. And we have stressed the need to identify a case where an official acting under similar circumstances was held to have violated the Fourth Amendment. For all these reasons, we respectfully request that this court reverse. Thank you. Thank you, counsel. Appreciate your argument today. The case is submitted. We'll render a decision in due course. And counsel, you may stand aside.